## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**TIMOTHY BROWN**
3519 Haywood Avenue
Baltimore, MD 21215

       *Plaintiff,*

   v.

**MAYOR AND CITY COUNCIL**
**BALTIMORE CITY**
c/o Ebony Thompson
Acting City Solicitor
City Hall - Room 250
100 N. Holliday St,
Baltimore, Maryland 21202

**BALTIMORE CITY**
**POLICE DEPARTMENT**
Michael S. Harrison
*Individually and in his Official*
*Capacity as a Baltimore City Commissioner*
601 East Fayette Street
Baltimore, Maryland 21202

**SERGEANT KEITH GLADSTONE (#E987)**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
Inmate No. 64564-037
Ashland Federal Correctional Institution
KY-716
Ashland, KY 41102

**DETECTIVE ROBERT HANKARD (#I370)**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
Inmate No. 65223-037
Montgomery Federal Prison Camp
Maxwell Air Force Base
Montgomery, AL 36112

**\*Jury Trial Demanded\***

Civil Case No. <u>1:23-cv-00155</u>

**OFFICER CARMINE VIGNOLA (#I296)**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
601 E Fayette Street
Baltimore, MD 21202

**DETECTIVE MICHAEL O'SULLIVAN (#G827)**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
601 E Fayette Street
Baltimore, MD 21202

**OFFICER KENNETH PATZMAN (#F850)**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
601 E Fayette Street
Baltimore, MD 21202

**DETECTIVE AVRAHAM TASHER (#I481)**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
601 E Fayette Street
Baltimore, MD 21202

**DETECTIVE ANTONIO SAUNDERS (H892)**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
601 E Fayette Street
Baltimore, MD 21202

**DETECTIVE BROWN**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
601 E Fayette Street
Baltimore, MD 21202

**DEAN PALMERE**
*Individually and in his Official*
*Capacity as a Former Baltimore City Police Commissioner*
601 E Fayette Street
Baltimore, MD 21202

*Defendants.*

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff Timothy Brown, by and through his attorney, Cary J. Hansel, and the law firm of Hansel Law, P.C., and sues the above-named Defendants, and as cause therefor states the following:

## INTRODUCTION

Plaintiff Timothy Brown was victimized by members of the Baltimore Police Department, primarily officers Keith Gladstone, Robert Hankard and Carmine Vignola, who have all since been convicted for engaging in corrupt activities including conspiracy to deprive civil rights and making false statements in connection with planting evidence at a crime scene. Officer Gladstone and Officer Hankard are currently serving time in federal prisons. Officer Vignola was released from federal prison 2021.

The defendant officers planted narcotics and firearms in Mr. Brown's home, or knew that other members of the Special Enforcement Section planted contraband, and coerced him into falsely admitting that the illicit items were his. Mr. Brown reluctantly pled guilty to one count of narcotics possession and one count of firearms possession by a prohibited person and was sentenced to nine (9) years in prison. He spent over five (5) years in prison before the extreme corruption of the Baltimore City Gun Trace Task Force and associated officers was revealed to the public, and his charges were dismissed *nolle prosequi.* These officers performed their criminal acts against the broader backdrop of a police department which condoned and/or actively promoted the violation of citizens' rights as ordinary practice. This pattern and practice of permitting corruption was exemplified by the actions of Deputy Commissioner Palmere, who coached officers under his supervision on how to testify in order to avoid accountability for violating the rights of citizens.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to its powers to resolve federal questions under 28 U.S.C. § 1331.

2.      Venue is proper in this Court because all of the material events occurred in Baltimore City, Maryland, which is in this district.

3.      The Complaint is filed within three years of the cause of action.

4.      The amount in controversy exceeds $75,000.

## PARTIES

5.      Plaintiff Timothy Brown **(hereinafter 'Mr. Brown' or 'Plaintiff')**, is, and was at all times relevant to the occurrence complained of herein, an adult resident of the State of Maryland.  Mr. Brown is the aggrieved party in this suit and currently resides at 3519 Haywood Avenue, Baltimore, MD 21215.

6.      Defendant Keith Gladstone **(hereinafter 'Gladstone')** was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer having the rank of sergeant, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.  Gladstone was a member of the Special Enforcement Section of the Baltimore Police Department.

7.      Defendant Robert Hankard **(hereinafter 'Hankard')** was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority

and color of law.  Hankard was a member of the Special Enforcement Section of the Baltimore Police Department.

8.      Defendant Kenneth Patzman **(hereinafter 'Patzman')** was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.  Patzman was a member of the Special Enforcement Section of the Baltimore Police Department.

9.      Defendant Avraham Tasher **(hereinafter 'Tasher')** was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.  Tasher was a member of the Special Enforcement Section of the Baltimore Police Department.

10.     Defendant Antonio Saunders **(hereinafter 'Saunders')** was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.  Saunders was a member of the Special Enforcement Section of the Baltimore Police Department.

11.     Defendant Brown **(hereinafter 'Brown')** was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer, and at all

times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.  Brown was a member of the Special Enforcement Section of the Baltimore Police Department.

12.     Defendant Deputy Commissioner Dean Palmere **(hereinafter 'Deputy Commissioner Palmere')** was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a Deputy Commissioner of the Baltimore Police Department, and at all times relevant hereto

13.     Defendant Baltimore City is a body politic and corporate body that may sue and be sued.

14.     Defendant Baltimore Police Department (hereinafter 'BPD') is a public entity established under the laws of Maryland to be sued in its own name.

## FACTS COMMON TO ALL COUNTS

11.     At the time of these events, Mr. Brown resided at 2811 Ruscombe Lane, Baltimore, MD 21215.

12.     On the morning of February 12, 2014, shortly after 9:00am, defendants obtained and executed a search and seizure warrant at the above residence.

13.     Neither Mr. Brown nor the homeowner, Zina Cunningham, Mr. Brown's mother, were present at the time.  Mr. Brown left the home earlier in the day to attend driving classes and his mother left for work.  No one else was inside the house at the time.

14.     The defendants used a battering ram to enter the residence.  They were inside the home for nearly 45 minutes before Ms. Cunningham arrived back home.

15.     Ms. Cunningham was placed under arrest within minutes of returning to her home and charged with narcotics and firearm possession.  The charges against her were ultimately dropped.

16.     A warrant was subsequently issued for Mr. Brown and he was arrested on or about March 26, 2014.

17.     Mr. Brown's bail was set at $750,000.

18.     From the date of his initial arrest through the present, Mr. Brown has repeatedly affirmed that the items allegedly found in the home did not belong to him and that he was not aware of their existence because they were not in the home prior to the officers executing the search and seizure warrant outside the presence of the home occupants.

19.     Mr. Brown was charged with over a dozen counts related to firearm and narcotics use and possession.

20.     On August 28, 2014, the day of his trial, the defendant officers would have testified against him.

21.     It was Mr. Brown's understanding, based on statements previously made to him by one or more of the defendant officers, that if he didn't take the plea, officers would return to the home and place his mother under arrest a second time.

22.     Fearing a long prison sentence due to his prior criminal history and retaliation against his mother if he continued to fight the charges, Mr. Brown pled guilty to one count of firearm possession and one count of possession of a controlled dangerous substance with the intent to distribute.

23.     Mr. Brown was sentenced to nine (9) years in prison and was not eligible for parole for the first five years.[1]

24.     The court also imposed a concurrent nine (9) year sentence for the charges associated with possession or distribution of a controlled dangerous substance.

25.     Mr. Brown's sentences were effective as of March 26, 2014, the date of his arrest.

26.     He was released from incarceration in 2019 after serving five years of his sentence and remained on parole.

27.     On January 21, 2020, the State filed an Amended Motion to Vacate Judgment stating that, *inter alia*:

   a.   On August 28, 2014, Sergeant Keith Gladstone, allegedly recovered a shotgun and suspected narcotics during the execution of the search warrant on Timothy Brown's residence.

   b.   On February 27, 2019, Sergeant Keith Gladstone was arrested by federal agents and charged with conspiracy to deprive an individual of his civil rights by intentionally presenting false evidence.

   c.   On May 31, 2019, Sergeant Gladstone pled guilty to the conspiracy charge.

   d.   On September 10, 2019, Officer Vignola was charged with False Declaration before a grand jury.  He pled guilty on September 23, 2019.

*See* Exhibit 1 (State's Amended Motion to Vacate Judgment).

28.     Additionally, Officer Saunders is on the Baltimore City State's Attorney's list of Baltimore Police officers with integrity issues.

---

[1] On February 21, 2017, Mr. Brown filed a Motion to Correct Illegal Sentence through his Public Defender.  On April 11, 2017, Honorable Jennifer Schiffer in the Circuit Court for Baltimore City granted the motion and vacated the no-parole provision of the plea agreement.

29.     As a result of the Defendants' actions, Plaintiff was wrongfully convicted and served five years in prison.  Plaintiff has suffered, and continues to suffer, mental anguish, emotional pain and suffering, and financial loss due to his unlawful incarceration at the hands of corrupt police officers.

30.     Defendants' actions were outrageous and beyond the bounds of decency.

31.     Defendants' acts abused their power and were used to oppress Mr. Brown.

32.     Defendants' acts were a foreseeable cause of the injuries sustained by Mr. Brown.

33.     At all times relevant hereto, Defendants subjected Mr. Brown to the deprivation of his rights with actual or implied malice, in an unreasonable and unnecessary fashion.

34.     Defendants' acts shocked the conscience and amount to an inhumane abuse of power, thereby subjecting Mr. Brown to a deprivation of his constitutional rights and privileges.

35.     At all times relevant hereto, Defendants acted without legal justification or excuse.

36.     At all times relevant hereto, Defendants acted with an evil and rancorous motive, influenced by hate, the purpose being to deliberately and willfully injure Mr. Brown, and by their intent to use their authority for their own pecuniary gain.

37.     At all times relevant hereto, Defendants acted deliberately, with ill will, improper motive, and actual malice.

38.     At all times relevant hereto, Defendants acted under color and pretense of law, and under color of statutes, customs, and usages of the State of Maryland.

39.     At all times relevant hereto, Defendants acted within the scope of their employment, with the power and authority vested in them as officers, agents, and employees of

Baltimore City and the Baltimore Police Department and incident to the pursuit of their duties as officers, employees and agents of Baltimore City and the Baltimore Police Department.

40.     Defendants and/or any other unnamed officers committed each of the acts knowingly, intentionally, and maliciously.  As a result, Mr. Brown is entitled to an award of compensatory and punitive damages.

41.     In the alternative, at all times relevant hereto, the Defendants acted with negligence and/or gross negligence in violation of the lawful duties owed Mr. Brown.

42.     As a direct and proximate result of the aforesaid conduct, actions, and inactions of Defendants, as well as those stated elsewhere herein, Mr. Brown was caused to suffer and continues to suffer mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, loss of society, shame, and loss of enjoyment of life.  Mr. Brown was caused to suffer and continues to suffer from economic damages, including, but not limited to, lost time and wages from work, and lost earning capacity, all to his great detriment.

43.     As a direct and proximate result of Defendants' unconstitutional acts, Mr. Brown suffered humiliation and extreme mental and post-traumatic emotional distress.

44.     Plaintiff further alleges that all of his injuries, losses and damages – past, present, and prospective – were caused solely by the actions of Defendants, as set forth above, without any negligence, want of due care, or provocation on the part of Plaintiff, either directly or indirectly.

## FACTS RELEVANT TO CLAIMS AGAINST
## DEPUTY COMMISSIONER PALMERE, BALTIMORE CITY, AND BPD

45.     The individual defendants' conduct as alleged herein was anything but uncommon within the BPD in the years preceding the unlawful detention and prosecution of Mr. Brown. As detailed below, at the time the Officers falsely arrested and maliciously prosecuted Mr. Brown, BPD officers routinely violated civilians' Fourth and Fourteenth Amendment rights by arresting them without the requisite probable cause.  This behavior was not only condoned, but encouraged, rewarded, and protected by defendants Baltimore City, BPD, and Deputy Commissioner Palmere.

46.     Deputy Commissioner Palmere, in his position of supervisory authority over Gladstone, Hankard, Vignola and other officers of defendant BPD, failed to enact or enforce policies to adequately ensure that officers were not engaging in falsifying evidence, giving false testimony, coercing false confessions, and maliciously prosecuting citizens.

47.     Defendants Baltimore City and BPD, through the individuals who execute their policies such as Deputy Commissioner Palmere and other supervisors, likewise failed to enact or enforce policies to adequately ensure that officers were not engaging in falsifying evidence, giving false testimony, coercing false confessions, and maliciously prosecuting citizens.

48.     In addition to failing to enact or enforce policy that would prevent such abuses of citizens' rights, Deputy Commissioner Palmere, Baltimore City, and BPD actively enforced and promoted policies that encouraged officers such as Gladstone, Hankard, Vignola to commit such abuses and subsequently protected officers from accountability for their violations of civil rights.

49.     Deputy Commissioner Palmere personally engaged in coaching officers in how to provide testimony in court to shield themselves from allegations of civil rights violations and illegal activity such as that for which Gladstone, Hankard and Vignola have been convicted.

11

50.     The aforesaid policies, or lack thereof, by which the defendants condoned or displayed deliberate indifference to violations of rights and criminal actions of police officers have been exemplified in an August 10, 2016 report of the United States Department of Justice, exposing the widespread corruption and abuse within BPD. *See* Exhibit 2 – DOJ Report.

51.     The Department of Justice concluded that "there is reasonable cause to believe that BPD engages in a pattern or practice of conduct that violates the Constitution or federal law. BPD engages in a pattern or practice of:

      a.     Making unconstitutional stops, searches, and arrest;

      b.     Using enforcement strategies that produce severe and unjustified disparities in the rates of stops, searches and arrests of African Americans

      c.     Using excessive force; and

      d.     Retaliating against people engaging in constitutionally-protected expression."

      *See* Exhibit 2, pg. 3.

52.     In regard to discrimination against African Americans, the report specifically found that "racial disparities in BPD's arrests are most pronounced for highly discretionary offenses: African Americans accounted for 91 percent of the 1,800 people charged solely with "failure to obey" or "trespassing"; 89 percent of the 1,350 charges for making a false statement to an officer; and 84 percent of the 6,500 people arrested for 'disorderly conduct.'" Exhibit 2, pg. 7.

53.     Finally, the report made a number of findings regarding the deficient policies, training, supervision, and accountability throughout the BPD, stating, "BPD's systemic constitutional and statutory violations are rooted in structural failures. BPD fails to use adequate

policies, training, supervision, data collection, analysis, and accountability systems, has not

engaged adequately with the community it policies, and does not provide its officers with the

tools needed to police effectively." Exhibit 2, pg. 10.

54.    The report stated that "[s]tarting in the late 1990s, Baltimore City and BPD

leadership expressly adopted a policing model that embraced the principles of "zero tolerance"

street enforcement.  According to City and BPD leaders, past and present, as well as media

reports, Baltimore City based its approach in part on tactics developed by the New York Police

Department and brought in consultants from NYPD's program to oversee its implementation in

Baltimore." Exhibit 2, pg. 40

55.    The strategy involved BPD officers making widespread use of pedestrian stops

and searches in a purported effort to seize guns and narcotics and deter crime.  As part of

the "zero tolerance" strategy, BPD leadership pressured officers to increase the number of arrests

and to "clear corners," whether or not the officers observed criminal activity. Exhibit 2, pg 41.

56.    BPD's implementation of "zero tolerance" resulted a massive increase in the

quantity of arrests—but a corresponding decline in quality. For example, of the 100,000

arrestees that BPD processed through Central Booking in 2004, over 20% were released without

charges.  Id.

57.    In June 2006, the ACLU of Maryland and the NAACP filed a lawsuit alleging

that BPD was illegally arresting thousands of residents every year.  The complaint

asserted that BPD had not properly trained officers on the legal standard necessary to make an

arrest, and had placed pressure on supervisors to bolster numbers, leading to citizens being

improperly detained without probable cause. Id. at 41.

58.    In 2010, BPD and the City entered into a settlement to resolve the ACLU lawsuit,

with BPD agreeing to adopt policies rejecting its former zero tolerance strategy and make changes to existing policies and procedures. Id. Notwithstanding the foregoing, BPD failed to implement changes contemplated by the 2010 settlement that were intended to curtail false arrests by BPD officers and, in so doing, perpetuated the practices first set in motion by BPD's "zero tolerance" policy. Id. at 42.

59.     Specifically, BPD's failure to engage in meaningful change was noted in the reports of an independent auditor established by the ACLU lawsuit settlement agreement. Id. After a four-year monitoring period had passed, the auditor determined that BPD had not reached full compliance on more than half of the conditions of the agreement. Id.

60.     Following the audit, it was apparent to BPD senior leadership that BPD officers were still not adequately reporting the circumstances surrounding arrests to allow for meaningful oversight of their conduct to provide any meaningful oversight of street-level enforcement activities. Id.

61.     In the years immediately preceding the arrest and malicious prosecution of Mr. Brown, BPD's lack of supervision over street-level enforcement activities by BPD officers perpetuated an operational culture in which such constitutional violations occurred on a persistent, widespread basis.

62.     For example, data maintained by the State of Maryland shows that, from November 2010–July 2015, BPD made thousands of arrests that reviewing officials declined to act upon. Id. at 35.

63.     Analysis of this data reveals that, from November 2010–July 2015, supervisors at Central Booking released 6,736 arrestees without charges being issued. Id. Moreover, prosecutors from the State's Attorney's Office declined to charge an additional 3,427 cases,

explicitly finding that 1,983 of the underlying arrests lacked probable cause. Id. In sum, BPD officers made at least 10,163 arrests that authorities immediately determined did not merit prosecution—an average of roughly 200 arrests per month. Id.

64.    However, it is clear that BPD supervisors at all levels of the chain of command were unconcerned with addressing the troubling amount of arrests being made by BPD officers in circumstances undeserving of criminal prosecution.

65.    For example, BPD incident reports regarding warrantless arrests that occurred during the same period of time reveal that BPD front line supervisors would consistently "sign off" (i.e., review and approve) subordinates' actions even when the reports describing the basis for warrantless arrests describe egregious constitutional violations. Id. at 45.

66.    In fact, after surveying thousands of BPD arrest reports for the period of time spanning November 2010–July 2015, the United States Department of Justice ("DOJ") could not identify a single arrest questioned by a front-line supervisor. Id. DOJ investigators also determined that BPD supervisors often only conducted reviews of such incident reports for purposes of "documenting" officer activity and were unconcerned with assessing the arrest conformed to constitutional standards. Id.

67.    Yet, as noted above, the lack of oversight regarding warrantless arrests by BPD officers was not limited to the front-line supervisors. Senior BPD leadership also failed to take action necessary to provide meaningful oversight in the form of data collection and pattern analysis. Id. at 46, 134-35.

68.    Specifically, despite maintaining information on arrests in a basic database, BPD leadership failed to conduct any analysis to identify trends in the type, frequency, or quality of arrests made by particular officers or units. Id. at 46.

69.     Indeed, far from looking for problematic trends in arrest data, BPD senior leadership created a culture which encouraged officers to make as many arrests as possible in that a BPD officer's performance was often evaluated by reference to the raw numbers of stops and arrests made, particularly for gun and drug offenses. Id. at 42. This model created a personal incentive for officers to commit false arrests because many BPD officers believed that the path to promotions and favorable treatment, as well as the best way to avoid discipline, was to increase their number of stops and make arrests for such offenses. Id.

70.     BPD fails to hold its officers responsible for misconduct of the kind at issue in this case. The failure in accountability flows from various BPD practices, to include:

     a.   discouraging members of the public from filing complaints;

     b.   improperly classifying complaints to mask misconduct;

     c.   delaying investigations of complaints unnecessarily; and

     d.   using poor investigative techniques to gather evidence about misconduct. Id. at 140-49.

72.     With regard to discouraging members of the public from filing complaints against officers, BPD places unnecessary conditions on the filing of complaints. While the Department ostensibly accepts complaints made in person, by telephone, or over email, it requires complaints alleging many common types of misconduct—including excessive force and false arrest/imprisonment—to be signed, notarized, and filed in person at one of just a few locations throughout the City. Id. at 140. Additionally, BPD required complaints alleging excessive force must be sworn under penalty of perjury. BPD does not investigate unless these requirements are met. Id.

73.     In addition, BPD officers expressly discouraging civilians from filing complaints,

16

sometimes mocking or humiliating them in the process. Id. at 140-41.

74.     Even when the BPD does an intake of a complaint, BPD investigators frequently misclassify those complaints as "minor allegations" so that they can be resolved by review of the chain of command as opposed to being investigated by the BPD Internal Investigation Department ("IID"). Id. at 141-42.

75.     Indeed, the majority of the approximately 38,000 allegations of misconduct made against BPD officers from 2010 through 2015 were resolved at the command level without referral to IID, resulting in significantly less investigation of those complaints. Moreover, of these 38,000 allegations, 9,694 allegations were categorized as "supervisor complaints," which require no investigation at all. Id.

76.     Accordingly, allegations handled as supervisor complaints virtually never result in discipline. Of the known 9694 "supervisor complaints" made in 2010-2015, BPD "administratively closed" 67 percent of the same and sustained just 0.27 percent of them, or 1 out of every 370 allegations. Additionally, BPD supervisors "administratively closed" 33 percent of all allegations received from 2010 through 2015—ensuring that the allegations would result in no further investigation or officer discipline. Id. at 141. These administrative closures occurred after minimal effort (and sometimes no effort at all) to contact the complainant. Id.

77.     By administratively closing complaints, BPD investigators avoid conducting any genuine investigation of the complaint and also evade BPD written policy requiring all complaints to be labeled as sustained, not sustained, exonerated or unfounded. Id.

78.     Moreover, BPD's misconduct investigations are frequently plagued by delays that compromise the evidence-gathering process and increase the likelihood that evidence of officer misconduct will not be found. Id.

79.     For example, even when BPD nominally "accepts" an external complaint and assigns the case to an investigator, the Department's practice in most cases is to not investigate that complaint until the individual appears in person at BPD's IID during business hours and participates in a formal, taped interview. Id. By declining to initiate an investigation until this occurs, BPD allows key evidence that could corroborate claims to be lost or destroyed. Id. Indeed, DOJ's review of BPD files found multiple instances in which investigators waited months before canvassing neighborhoods in which alleged misconduct occurred. Id. at 142-43.

80.     In addition to frequent delays that limit the information available about misconduct allegations, poor investigative techniques further compromise BPD's investigations. Id. at 144.  First, investigators fail to adequately consider evidence and statements from witnesses or other officers that contradict explanations provided by officers accused of misconduct. Id. Indeed, BPD appears to apply a standard that favors officers when evaluating statements made by complainants and involved officers. Id. While BPD's Internal Affairs Manual encourages investigators to be wary of a complainant's inconsistent statements, the Department permits officers to submit addendums that clarify their original statements. Id. And when inconsistencies arise—either from such addenda or other evidence—investigators generally discredit or discount entirely evidence contradicting the accused officer's account. Id.

81.     Second, BPD investigators compromise officer interviews by failing to probe beyond reports the accused officer already provided, and performing unrecorded "pre-interviews" with accused officers. Id. These pre-interviews compromise the integrity of an investigation. Likewise, there are numerous instances in which the interview of the accused officer merely consists of the officer orally reciting a prior written report, without IID investigators making any effort to probe beyond this oral recitation. Id. These interview

techniques inhibit the function of IID investigators to obtain reliable information from officers accused of misconduct. Id.

82.     Third, BPD risks compromising investigations by providing accused officers with a detailed notice describing the alleged misconduct, often right after a complaint has been filed and before any investigation occurs.  The Department's own internal affairs audit identified these same potential problems in 2014. Id. The Department nonetheless continues to use its early notification practice. Id.

83.     The deficient nature of BPD investigations is the direct result of a lack of supervision and oversight by BPD leadership. Id. BPD supervisors fail to identify deficiencies or questionable findings in investigations and commanders consistently approve investigative findings, even where investigative files are deficient or incomplete. Id. at 145.  Nor do supervisors meaningfully review investigators' determinations about whether to sustain complaints. Id. Indeed, investigators are not required to have supervisors review and sign off on investigations that resulted in findings of "not sustained," although supervisors must approve an investigation that results in a finding of "sustained." Id.

84.     Deficiencies in BPD's complaint intake and investigation processes contribute to BPD's extremely low rate of sustaining allegations of officer misconduct, which in turn leads to a lack of discipline and accountability in the Department. Id. at 146. Discipline for allegations of serious misconduct is rare. Id. For example, of the 1,382 allegations of excessive force that BPD tracked from 2010 through 2015, only 31 allegations, or 2.2 percent were sustained. This was significantly lower than the amount of incident involving excessive force that can be identified from the same files. Id.

85.     Even in the rare instances in which a complaint is "sustained," the administrative

process for imposing discipline permits the accused officer significant control over the disciplinary proceedings, further rendering the possibility of discipline unlikely. Id. at 147. Indeed, the common perception among BPD officer is that discipline is only imposed in situations covered by the press or in which the officer has crossed a supervisor, and is in no way connected to the actual magnitude of the misconduct involved. Id.

86.     The longstanding deficiencies in BPD's systems for investigating complaints has contributed to a cultural resistance to accountability that persists in the Department. The cultural opposition to meaningful accountability within the Department is reflected by the lack of discipline for serious misconduct and widespread violations of minor policy provisions; the failure to take action against officers with a known reputation for repeatedly violating Department policy and constitutional requirements; and the reluctance of officers to report observed misconduct for fear that doing so will subject them to retaliation. Id. at 149-53.

## THE RESULT OF PLAINTIFF'S UNCONSTITUTIONAL AND MALICIOUSLY-PURSUED PROSECUTION

87.     As a direct and proximate result of the aforementioned conduct, actions, and inactions of Defendants, as well as those stated elsewhere herein, Mr. Brown was caused to suffer and continues to suffer mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, loss of society, shame, and loss of enjoyment of life. Mr. Brown was caused to suffer from economic damages, including, but not limited to, lost time and wages from work, and lost earning capacity, all to his great detriment.

88.     Plaintiff further alleges that all of his injuries, losses, and damages related to this incident were caused solely by the actions of Defendants, as set forth above, without any negligence, want of due care, or provocation on the part of Plaintiff, either directly or indirectly.

89.     Defendants' acts abused their power and were used to oppress Mr. Brown.

90.     Defendants' acts were a foreseeable cause of the injuries sustained by Mr. Brown.

91.     At all times relevant hereto, Defendants subjected Mr. Brown to the deprivation of his rights with actual or implied malice, in an unreasonable and unnecessary fashion.

92.     Defendants' acts subjected Mr. Brown to a deprivation of his constitutional rights and privileges.

## COUNT I (42 U.S.C. § 1983 – 4th Amendment Malicious Prosecution) <u>Versus the Individual Defendants</u>

93.     Every paragraph not falling under this Count is incorporated herein by reference.

94.     Defendants Gladstone, Hankard, Vignola, O'Sullivan, Patzman, Tasher, Saunders, Brown, and Palmere deprived Mr. Brown of his rights under the Fourth Amendment of the United States Constitution, said rights including freedom from unreasonable search and seizure, freedom from arrest without probable cause, and freedom from malicious prosecution without probable cause.

95.     At all relevant times, the Defendant officers acted under color of State law, within their capacity and authority as Baltimore City police officers. At all relevant times, Defendant Palmere was the Deputy Commissioner of the BPD, responsible for his own actions in supervising the investigation of the Plaintiff as well as the misconduct of his employees through the policies he set as evidenced by his involvement in covering up the crimes of the members of the GTTF.

96.     The Defendants instituted and continued a criminal proceeding against the Plaintiff. This was done through the acts outlined above, including, but not limited to, applications for warrants and charges and the submission of materials and approvals supportive of those applications, the submission of evidence and reports, and the offering of false and misleading testimony.

21

97.     The Defendants instituted and continued a criminal proceeding against the Plaintiff without probable cause. There was not sufficient evidence against the Plaintiff to form the basis for probable cause at any point. Any determinations to the contrary were unlawfully obtained by the Defendants through the falsification of police reports as well as perjurious testimony.

98.     After Plaintiff was arrested on March 26, 2014, he was incarcerated until he was released on parole in 2019, *five years after his initial arrest*. The Defendants' actions deprived Plaintiff of his liberty for over five years. Plaintiff did not consent to the Detective Defendants' deprivation of his liberty.

99.     All proceedings terminated in favor of the Plaintiff when his conviction for the crimes resulting from this incident was vacated.[2]

100.    As a result of the above-described malicious prosecution of the Plaintiff, he was deprived of his liberty without probable cause and denied his rights under the Fourth Amendment of the United States Constitution.

101.    In addition to reviewing and approving the documentation submitted by the Detective Defendants despite knowing of the deficiencies listed elsewhere herein, Defendant Palmere encouraged policies and procedures and promoted the departmental culture which permitted the misconduct at issue in this case.

102.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced pain, suffering, humiliation, and embarrassment, all to his detriment.

---

[2] The State filed their amended complaint on January 21, 2020 and the Circuit Court for Baltimore City entered a disposition of *nolle prosequi* on all charges on March 10, 2020.  *See* Exhibits 1, 3.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

**COUNT II (42 U.S.C. § 1983 – 14th Amendment Malicious Prosecution) Versus the Individual Defendants**

103.     Every paragraph not falling under this Count is incorporated herein by reference.

104.     At all relevant times, the Defendant officers acted under color of State law, within their capacity and authority as Baltimore City police officers.

105.     Defendants Gladstone, Hankard, Vignola, O'Sullivan, Patzman, Tasher, Saunders, Brown, and Palmere deprived Mr. Brown of his rights under the Fourteenth Amendment of the United States Constitution, said rights including freedom from summary punishment, his right of access to the courts, and his right to due process.

106.     The Defendants acted with malice and/or with a motive other than to bring any alleged offender to justice. The Defendants manufactured, altered, destroyed, or covered-up evidence which rendered Plaintiff's ability to present his criminal defense effectively and adequately, interfering with his right of access to the courts as protected by the Fourteenth Amendment to the United States Constitution.

107.     Mr. Brown sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced emotional pain, suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

**COUNT III (MD Declaration of Rights Malicious Prosecution)**
**<u>Versus All Defendants</u>**

108.    Every paragraph not falling under this Count is incorporated herein by reference.

109.    Articles 24 and 26 of the Maryland Declaration of Rights protect people in Maryland against unreasonable search or seizure and violations of their rights to due process of law.

110.    The Defendants instituted and continued a criminal proceeding against the Plaintiff. This was done through the acts outlined above, including, but not limited to, applications for warrants and charges and the submission of materials and approvals supportive of those applications, the submission of evidence and reports, and the offering of false and misleading testimony.

111.    The Defendants instituted and continued a criminal proceeding against the Plaintiff without probable cause. There was not sufficient evidence against the Plaintiff to form the basis for probable cause at any point. Any determinations to the contrary were unlawfully obtained by the Defendants through the falsification of police reports as well as perjurious testimony.

112.    The Defendants acted with malice and/or with a motive other than to bring any alleged offender to justice. The Defendants manufactured, altered, destroyed, or covered-up evidence which rendered Plaintiff's ability to present his criminal defense effectively and adequately, interfering with his right of access to the courts as protected by the Maryland Constitution.

113.    After Plaintiff was arrested on March 26, 2014, he remained incarcerated until he was released on parole in 2019. The Defendants' actions deprived Plaintiff of his liberty for five years. Plaintiff did not consent to the Detective Defendants' deprivation of his liberty.

114.    All proceedings terminated in favor of the Plaintiff when his convictions for the crimes resulting from this incident were vacated.

115.    As a result of the above-described malicious prosecution of the Plaintiff, he was deprived of his liberty without probable cause and denied his rights under the Fourth Amendment of the United States Constitution.

116.    In addition to reviewing and approving the documentation submitted by the Detective Defendants despite knowing of the deficiencies listed elsewhere herein, Defendant Police Commissioner and Defendant Palmere encouraged policies and procedures and promoted the departmental culture which permitted the misconduct at issue in this case.

117.    The individual Defendants committed the tortious acts or omissions described herein within the scope of employment with Baltimore City. As such, Defendant Baltimore City is liable for the Detective Defendants' conduct under the Local Government Tort Claims Act. In the alternative, the individual Defendants' tortious acts or omissions were outside of the scope of employment with Baltimore City and the individuals are personally liable for their own conduct. In either case, the Defendant Baltimore City is liable, under a theory of respondeat superior, for the violations of the Maryland Declaration of Rights detailed above.

118.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced pain, suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

## COUNT IV (Common Law Malicious Prosecution)
### Versus All Defendants

119.    Every paragraph not falling under this Count is incorporated herein by reference.

120.    The Defendants instituted and continued a criminal proceeding against the Plaintiff. This was done through the acts outlined above, including, but not limited to, applications for warrants and charges and the submission of materials and approvals supportive of those applications, the submission of evidence and reports, and the offering of false and misleading testimony.

121.    The Defendants instituted and continued a criminal proceeding against the Plaintiff without probable cause. There was not sufficient evidence against the Plaintiff to form the basis for probable cause at any point. Any determinations to the contrary were unlawfully obtained by the Defendants through the falsification of police reports as well as perjurious testimony.

122.    The Defendants acted with malice and/or with a motive other than to bring any alleged offender to justice. The Defendants manufactured, altered, destroyed, or covered-up evidence which rendered Plaintiff's ability to present his criminal defense effectively and adequately, interfering with his right of access to the courts as protected by the Maryland Constitution.

123.    After Plaintiff was arrested on March 26, 2014, he was incarcerated until he was released on parole in 2019, *five years after his initial arrest*. The Defendants' actions deprived Plaintiff of his liberty for over five years. Plaintiff did not consent to the Detective Defendants' deprivation of his liberty.

124.    All proceedings terminated in favor of the Plaintiff when his convictions for the crimes resulting from this incident were vacated.

125.    As a result of the above-described malicious prosecution of the Plaintiff, he was deprived of his liberty without probable cause and denied his rights under the Fourth Amendment of the United States Constitution.

126.    In addition to reviewing and approving the documentation submitted by the Detective Defendants despite knowing of the deficiencies listed elsewhere herein, Defendant Police Commissioner and Defendant Palmere encouraged policies and procedures and promoted the departmental culture which the permitted the misconduct at issue in this case.

127.    The individual Defendants committed the tortious acts or omissions described herein within the scope of employment with Baltimore City. As such, Defendant Baltimore City is liable for the Detective Defendants' conduct under the Local Government Tort Claims Act. In the alternative, the individual Defendants' tortious acts or omissions were outside of the scope of employment with Baltimore City and the individuals are personally liable for their own conduct. In either case, the Defendant Baltimore City is liable, under a theory of *respondeat superior*, for the violations of the Maryland Declaration of Rights detailed above.

128.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced pain, suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

## COUNT V (Negligent Training, Supervision,
## & Retention Resulting in Malicious Prosecution)
## Versus Defendants Baltimore City, Police Commissioner, and Palmere

129.    Every paragraph not falling under this Count is incorporated herein by reference.

130.    Defendant Baltimore City, Defendant Police Commissioner, and Defendant Palmere had a duty to ensure BPD officers were trained to conduct their law enforcement activities within constitutional and common law prohibitions against malicious prosecution. Defendant Baltimore City, Defendant Police Commissioner, and Defendant Palmere had a duty to discipline and/or fire officers who failed to conduct their law enforcement activities within the constitutional and common law prohibitions against malicious prosecution.

131.    Defendant Baltimore City, Defendant Police Commissioner, and Defendant Palmere breached the duties described above by failing to train officers to meet the obligations described and by affirmatively permitting violations of the constitutional and common law prohibitions against malicious prosecution.

132.    The breaches of duties cited above were the direct and proximate cause of the violations of Plaintiff's constitutional and common law rights not to be maliciously prosecuted.

133.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced pain, suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

## COUNT VI (4th Amendment *MONELL* Claim
## for a Pattern or Practice of Malicious Prosecution)
## <u>Versus Defendant Baltimore City</u>

134.    Every paragraph not falling under this Count is incorporated herein by reference.

135.    Defendants Baltimore City and BPD failed to adequately train, supervise, and discipline their officers against arrest, imprisonment, and prosecution without probable cause. the failure to properly train, supervise, and discipline officers demonstrates a gross disregard for the constitutional rights of the public and the Plaintiff, and was a proximate cause of Mr. Brown's injuries.

136.    Baltimore City and BPD have instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to arrest without probable cause. Among those practices are the following:

    a.    The use of arrest and imprisonment without probable cause occurs so frequently that it has become accepted manner by the Defendants and other employees of Baltimore City and BPD. This is a result of Baltimore City and BPD's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that officers will not arrest and imprison citizens without probable cause and to ensure that allegations of false arrest and imprisonment will be thoroughly investigated and appropriately punished when found to have occurred. as a result of this failure, there has been a regular pattern and practice of arrest and imprisonment without probable cause, and failure to investigate. This pattern and practice has been manifested in other prior incidents involving city officers.

    b.    Baltimore City and BPD have failed to effectively instruct officers that they have a duty to prevent and report arrest without probable cause when it occurs.

c.  Baltimore City and BPD have failed to keep accurate records as to the number of false arrests and imprisonments of citizens by members of its police force. This policy encourages the use of arrest without probable cause in an improper manner and inhibits Baltimore City from critically evaluating the need for a change in training.

d.  Baltimore City and BPD lack an affective internal affairs procedure and has no meaningful system to control and monitor the recurrence of false arrest and testimony by officers who have a pattern or history of such behavior.

e.  The policies and customs of Baltimore City and BPD, as set forth herein, demonstrate a gross disregard for the constitutional rights of the public and the plaintiff. At the time of injury to the Plaintiff, the Defendants were operating under unconstitutional customs, policies, and procedures. These customs, policies, and procedures were a proximate cause of the injuries to Mr. Brown.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

### COUNT VII (14th Amendment *MONELL* Claim
### for a Pattern or Practice of Malicious Prosecution)
### <u>Versus Defendant Baltimore City</u>

137.  Every paragraph not falling under this Count is incorporated herein by reference.

138.  Defendants Baltimore City and BPD failed to adequately train, supervise, and discipline their officers against arrest, imprisonment, and prosecution without probable cause. the failure to properly train, supervise, and discipline officers demonstrates a gross disregard for the

constitutional rights of the public and the Plaintiff, and was a proximate cause of Mr. Brown's injuries.

139.    Baltimore City and BPD have instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to arrest without probable cause. Among those practices are the following:

a. The manufacture, destruction, covering-up, hiding of evidence and offer of false testimony occurs so frequently that it has become accepted manner by the Defendants and other employees of Baltimore City and BPD. This is a result of Baltimore City and BPD's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that evidence will not be manufactured, destroyed, covered-up, or hidden, to ensure no false testimony is given, and to ensure that allegations to the contrary will be thoroughly investigated and appropriately punished when found to have occurred. as a result of this failure, there has been a regular pattern and practice of the manufacture, destruction, covering-up, hiding of evidence, offering of false testimony and failure to investigate. This pattern and practice has been manifested in other prior incidents involving city officers.

b. Baltimore City and BPD have failed to effectively instruct officers that they have a duty to prevent and report the manufacture, destruction, covering-up, hiding of evidence, and offering of false testimony when it occurs.

c. Baltimore City and BPD have failed to keep accurate records as to the number of instances of manufacturing, destroying, covering-up, hiding of evidence, and offer of false testimony by members of its police force. This policy encourages falsifying

evidence and inhibits Baltimore city from critically evaluating the need for a change in training.

d.  Baltimore City and BPD lack an affective internal affairs procedure and has no meaningful system to control and monitor the recurrence of false arrest and testimony by officers who have a pattern or history of such behavior.

e.  The policies and customs of Baltimore City and BPD, as set forth herein, demonstrate a gross disregard for the constitutional rights of the public and the plaintiff. At the time of injury to the Plaintiff, the Defendants were operating under unconstitutional customs, policies, and procedures. These customs, policies, and procedures were a proximate cause of the injuries to Mr. Brown.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees

### COUNT VIII (*LONGTIN* Claim for a Pattern or Practice of Article 24 & 26 Malicious Prosecution) <u>Versus Defendant Baltimore City</u>

140.    Every paragraph not falling under this Count is incorporated herein by reference.

141.    The Plaintiff's state constitutional rights were violated as described elsewhere herein.

142.    Baltimore City is responsible for setting policy and procedures governing the conduct of the individual defendants, all of whom are Baltimore City police officers.

143.    Baltimore City maintained policies, customs, patterns and practices in its police department of violating the constitutional rights of people in Baltimore City to be free from malicious prosecution in violation of Articles 24 and 26 of the Maryland Declaration of Rights.

144.     Baltimore City's policies, customs, patterns and practices of violating the constitutional rights of people in the City to be free from malicious prosecution in violation of Articles 24 and 26 of the Maryland Declaration of Rights where the actual direct and proximate cause, as well as the moving force behind the violation of the Plaintiff's constitutional rights.

145.     The above-described policies, customs, patterns and practices of Baltimore City are so widespread as to rise to the level of official policy promulgated by Baltimore City.

146.     Baltimore City failed to ensure that their officers conducted their law enforcement activities within constitutional bounds. Further, Baltimore City has permitted and tolerated a pattern and practice of unjustified, unreasonable, and unlawful abuses of their officers' law enforcement authority, constituting a pattern or practice of law enforcement officers employed by Baltimore City conducting their law enforcement activities unconstitutionally. This unconstitutional pattern or practice has resulted in officers employed by Defendant Baltimore City consistently and continuously violating citizens' constitutional rights, including maliciously pursuing prosecution without probable cause, failing to conduct full and complete investigations, and routinely ignoring exculpatory evidence.

147.     Thus, the deprivation of Plaintiff's rights, as described herein, represents not a single isolated, accidental, or peculiar event, but occurrences in the regular procedures followed by these officers, constituting an illegal pattern or practice of such conduct.

148.     Defendant Baltimore City is aware of, or, in the alternative, should have been aware of, the illegal pattern or practice of their officers conducting their law enforcement activities unconstitutionally.

149.     In addition, Defendant Baltimore City caused their employees to believe that conducting their law enforcement activities unconstitutionally would not be aggressively,

honestly, and properly investigated by failing to adequately discipline officers engaging in such misconduct.

150.    Defendant Palmere has been publicly and explicitly accused of approving and encouraging the unconstitutional policing tactics utilized by BPD officers, approving and facilitating such misconduct. For example, Palmere has been accused of coaching officers on how avoid legal repercussions and accountability for their tortious, wrongful, and unconstitutional actions performed within the scope of their duties. Defendant Baltimore City should have foreseen that such policies would promote the proliferation of constitutional violations of citizens' rights, without justification, due process, or probable cause.

151.    Defendant Baltimore City has instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage employees to violate the rights of citizens.

152.    This is a result of Defendant Baltimore City's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that such violations do not occur and to ensure that allegations of such violations will be thoroughly investigated and appropriately punished when found to have occurred. As a result of this failure, there has been a regular pattern and practice of conduct similar to that complained of here. This pattern and practice has been manifested in other prior incidents against Defendant Baltimore City.

153.    Defendant Baltimore City has failed and refused to take even elementary steps to protect citizens from the type of abuses detailed above.

154.    The policies and customs of Defendant Baltimore City, as set forth herein, demonstrate a gross disregard for the constitutional and other rights of the public and the Plaintiff, and were a proximate cause of the injuries suffered by Plaintiff.

155.    In addition to the affirmative policy of unconstitutionally and maliciously prosecuting people as described above, Defendant Baltimore City maintains policies, customs, patterns, and practices of inadequately training officers to avoid unconstitutionally and maliciously prosecuting people.

156.    This failure to train officers to avoid unconstitutionally and maliciously prosecuting people amounts to deliberate indifference to the rights of persons with whom the police come into contact.

157.    The training and retention procedures of Defendant Baltimore City and the BPD are so inadequate as to demonstrate deliberate indifference in adopting the hiring and training policies and these inadequate hiring or training policies directly caused the plaintiff's injury.

158.    Defendant Baltimore City, through the BPD, had actual and constructive knowledge of continuing constitutional violations and failed to carry out their duty to correct them.

159.    Defendant Baltimore City, through the BPD, has both explicitly and tacitly approved of the type of misconduct of police officers which is the subject of this lawsuit.

160.    Dozens of people have sued Baltimore City and BPD over the type of misconduct of police officers which is the subject of this lawsuit and obtained settlements from Baltimore City after their convictions were vacated as a result of the indictment of members of BPD's GTTF. Ivan Potts said he was walking down the street on September 2, 2015 when several officers jumped out of an unmarked car, stopped him, and then demanded that he consent to a search. When Mr. Potts didn't comply with the request, the officers then slammed him to the ground, and began kicking and beating him while he lay there helpless. Officers handcuffed and then searched him; Mr. Potts said they found no drugs nor weapons. But he said one of the officers produced a gun, and they forced Potts to hold the weapon to get his fingerprints on it. Because of previous convictions, Mr.

Potts was charged with six counts related to being a felon in possession of a weapon. At trial, six of the officers testified falsely against him, and Mr. Potts was convicted of three counts on March 2, 2016 and sentenced to eight years in prison. Because Mr. Potts' arrest involved at least one member of the GTTF, his conviction was vacated on April 12, 2017, and charges dismissed on May 16, 2017. Mr. Potts received a $32,000 settlement from Baltimore City after serving about 19-months in prison.

161.    Blanton Roberts was arrested in a similar manner. He said several Baltimore City police officers came up on his porch while on patrol on October 7, 2015. One of the officers said that Mr. Roberts had tugged on his waistband, suggesting the presence of a weapon. The officers said in their report that Mr. Roberts tossed a weapon off the porch, which they later found during a search. Roberts said the officers planted the weapon to justify his arrest. Baltimore City police officers charged Mr. Roberts with illegal possession of a weapon and several related counts. Mr. Roberts had previous felony convictions and pled guilty on July 12, 2016. Because Mr. Robert's arrest involved at least one member of the GTTF, Mr. Roberts's charges were dismissed on July 5, 2017. Mr. Roberts received a $165,000 settlement from Baltimore City after serving two years in prison.

162.    Kevron Evans, a rapper known as "Young Moose," was also arrested in a similar manner. Mr. Evans and a friend were leaving a bar in Baltimore City when three Baltimore City police officers approached them. Without cause, the officers search both men before detaining Mr. Evans and letting the friend go, despite nothing illegal being found. The officers then took Mr. Evans to a different location where another Baltimore City police officer was at by the name of Hersl. Hersl told the other officers to search Mr. Evans again and, after not finding anything again, Hersl got something from his trunk and placed it in Mr. Evans' pocket. Mr. Evans was charged

with multiple drug felonies. Mr. Evans accepted a plea deal and received a suspended jail sentence and probation. Baltimore City police continued to harass and target Mr. Evans with false allegations in an attempt to violate his probation. Mr. Evans ended up spending about two years in jail while fighting the charges against him. Because Mr. Evans' arrest involved at least one member of the GTTF, Mr. Evans' conviction was vacated in 2020 and he received a settlement of $300,000 from Baltimore City.

163.   Dawud Morris was arrested in 2011 after police officers fabricated a search warrant and claimed to have found drugs and a gun in his home. Mr. Morris said that the officers involved faked a search warrant and planted the gun. Because Mr. Morris' arrest involved at least one member of the GTTF, his conviction was vacated, and he received a $400,000 settlement from Baltimore City for serving about five years in prison on charges related to his arrest.

164.   Donte Pauling was arrested after he was chased unprovoked by Baltimore City police officers in an unmarked car and was said to have thrown a gun into the alley while being pursued. Because Mr. Pauling's arrest involved at least one member of the GTTF, his conviction was vacated, and he received a $165,000 settlement from Baltimore City for serving about two years in prison on charges related to his arrest.

165.   Kendrick Johnson was followed leaving a grocery store by two unmarked cars with Baltimore City police officers in them. Mr. Johnson was stopped by the officers, who planted a gun on his person and said he would go to jail unless he provided information about a nearby murder. Saying he had no knowledge of the case, he was arrested and charged with handgun violations. Mr. Johnson spent three years in prison. Because Mr. Johnson's arrest involved at least one member of the GTTF, his conviction was vacated, and he received a $125,000 settlement from Baltimore City.

166.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and continues to suffer, mental pain and suffering as a result of the year and two months spent incarcerated for a crime that he did not commit, including, but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, loss of society, shame, grief, anxiety, and loss of enjoyment of life. Mr. Brown has further suffered, and continues to suffer, economic damages including, but not limited to, lost earning capacity.

WHEREFORE, the Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, attorneys' fees, injunctive relief ordering Defendants from continuing to utilize the illegal and unconstitutional policing tactics described herein, and such other relief as this Honorable Court deems appropriate.

### COUNT IX (42 U.S.C. § 1985 Conspiracy to Interfere with Civil Rights) Against All Defendants

167.     Plaintiff adopts and incorporates by reference the allegations contained in the foregoing paragraphs with the same effect as if herein fully set forth.

168.     The defendants conspired to deter the Plaintiff, by force, intimidation, or threat, from testifying freely, fully, and truthfully regarding his knowledge of the ownership of the firearm and narcotics in question.  In doing so, they impeded, hindered, obstructed, or defeated the due course of justice with intent to deny to Plaintiff the equal protection of the laws.

169.     The individual defendants committed acts in furtherance of the object of such conspiracy, such as the planting of evidence, the coercive interrogation tactics, and the willingness to offer false testimony.

170.     Mr. Brown sustained damages as a direct and proximate result of this conspiracy, was deprived of having and exercising the rights and privileges of a citizen of the United States,

as well as consciously experiencing pain and suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, the Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, attorneys' fees, injunctive relief ordering Defendants from continuing to utilize the illegal and unconstitutional policing tactics described herein, and such other relief as this Honorable Court deems appropriate.


## JURY DEMAND

Plaintiff demands a jury trial as to all claims so triable.


Respectfully submitted,

HANSEL LAW, PC

*/s/ Cary Hansel*

_____
Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, Maryland 21218
Phone:      301-461-1040
Facsimile: 443-451-8606
*Counsel for Plaintiff*